# Clarke *versus* The Birmingham and Pittsburgh Bridge Company.

*Bridge Company, power of to erect Piers in Navigable Stream.—Liability of for Consequential Damages.—Acts of* 1725 *and* 1803 *as to erection of Bridges over Navigable Streams construed.—Improper Exercise of chartered Privileges redressed only on complaint of Commonwealth.*

1. A general power given to a company by Act of the Legislature, to construct a bridge over a navigable river, when limited by no express restrictions, includes the right to construct and maintain piers in the bed of the stream, that mode of support being at the time of the grant and since, common and usual.

2. In the proper exercise of such a right, the bridge company are not liable for any loss sustained, consequent merely upon the erection and maintenance of the piers, which, though they may be in some degree obstructions to the navigation, are not for that person alone unlawful.

3. A grant of the *eminent domain* of the Commonwealth, so far as it is not specially restricted, passes the immunity which pertained to it while it was in the hands of the state; and the Commonwealth having the right to build the bridge, with piers to support it, without liability for consequential damages, the bridge company have the same rights and immunity.

4. The Act of August 14th 1725, relating to a drawbridge on Chester creek, and providing that no bridge should be erected over any river or navigable stream, so as to hinder navigation, &c., applies only to bridges erected without authority of law, and cannot take from a subsequent legislature the power to authorize the construction of a bridge with piers over a navigable stream; and a charter for a bridge company, under the Act of April 3d 1837, is not subject either to that act or to the Mill-Dam Act of 1803, which applies only to dams erected under it, and prohibits only such obstructions as are not legalized by statute.

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

5. The right to erect a bridge under a charter necessarily includes a right to fix the number and location of the piers, at the discretion of the company; for a wanton abuse or a careless and negligent exercise of that right, resulting in immediate injury to an individual, a private action might be maintained; but the company are not responsible where the damages result merely from a mistake of judgment in locating the pier.

6. The state alone has power to redress a wrong done to the public by an improper location of the piers, and to compel the removal of the obstructions; it cannot be accomplished by a private suit.

7. Dugan *v.* Monongahela Bridge Co., 3 Casey 310; Bacon *v.* Arthur, 4 Watts 437, and Plummer *v.* Alexander, 2 Jones 81, commented on and distinguished; Monongahela Navigation Co. *v.* Coon, 6 Barr 382, affirmed.

ERROR to the District Court of *Allegheny county.*

This was an action on the case, brought February 20th 1860, by Samuel Clark, against The President and Managers of the Birmingham and Pittsburgh Bridge Company, to recover damages for the loss of a loaded coal-boat, which was destroyed by collision with one of the piers built by the company in the Monongahela river, between Cross street, in the city of Pittsburgh, and McKee street, in the borough of Birmingham, Allegheny county.

The defendants were incorporated in 1837, and completed their bridge in the fall of 1857. The collision, by which plaintiff's boat was destroyed, occurred on the 16th of January 1860.

The plaintiff declared against the defendants for wrongfully and unlawfully building, keeping, and maintaining in the Monongahela river, a public highway, certain piers of their bridge, located in and near the ordinary channel for coal-boats and other craft; which piers, he averred, by reason of such location, were an unlawful obstruction and common nuisance in said river, at Pittsburgh; and further, for carelessly, negligently, and unskilfully locating, building, keeping, and maintaining in and near the ordinary coal-boat channel in said river, certain erections called piers, thereby obstructing the navigation of the said river for coal-boats and other crafts, contrary to the law and the rights of the public in the premises; by reason whereof the plaintiff's coal-boat, on the 16th day of January, A. D. 1860, being at the time in charge of a competent pilot and crew, and navigated with ordinary care and skill, in said river, at the defendants' bridge, was wrecked upon the second pier thereof from the Pittsburgh side, and was wholly lost. To which the defendants pleaded *non cul.*

On the trial, the plaintiff produced in evidence certain Acts of Assembly and laws of the Commonwealth of Pennsylvania, which were admitted by the court; to wit, the Act of 13th April 1782, 2 Bioren 43, 44, declaring the Monongahela river a public highway; also the Act of 14th August 1724–5, declaring that, at any time to come, no bridge, frame, or device whatsoever shall be *made, erected, upheld, sustained, or repaired,* over any creek or river within this province, in such manner as to in any wise

[Clarke v. Birmingham and Pittsburgh Bridge Co.]

stop or hinder the navigation thereof for any sloop, shallop, flat, or other craft, or floats of logs, &c: 1 Bioren 168, § 2. Also, the Act of March 23d 1803, § 2, Purdon 600, and the Act of April 3d 1837, P. L. 239, the original act authorizing the erection of the bridge, together with the Act of February 22d 1853, reviving and re-enacting the original act: P. L. 93, 498.

And to support the issue on his part, offered the testimony of several witnesses to prove the unlawful and wrongful acts and conduct of the defendants in the premises, and called as a witness Captain Alex. Hayes, civil engineer, who testified that he had examined the Monongahela river at and about the site of defendants' bridge, and made a plot of the same, from the locks of the Navigation Company to the bridge, some 2200 feet; that the structure is built of wood, with stone abutments and piers, on the How or Hall patent truss plan, and extends from Cross street, on the Pittsburgh shore, to McKee street, on the Birmingham shore of the river, supported by one abutment on each shore, and five piers set in the bed of the river; the *first* pier being 205 feet from the abutment, the second pier 223 feet from the first, from centre to centre, and the remaining piers about 200 feet apart; that the said piers, especially the first, second, and third from the Pittsburgh shore, are not judiciously located with respect to the navigation of the river; in point of economy they are; but they are not set in the thread of the stream, and occupy greater space than they would if set in a line with the current; that the spans could have been increased to 300, and even to 400 feet; that short spans are stronger, but witness would have located the piers differently, by setting the first and second piers farther out into the river, and by shortening some of the spans, and lengthening others, which would have been cheaper than the plan adopted; that 300 feet spans is the maximum laid down by Haupt, but 400 feet would probably be the maximum for spans of a wooden bridge; that the expense increases with the span, and that the piers could have been set in a direct line with the current, so as to leave the entire space between them for the passage of boats.

That the most common and least expensive plan is for wooden bridges; but the most extensive spans are in the iron suspension bridges, one of which spans the Ohio river at Wheeling with one span, another the Niagara river with one span—a railroad bridge; that it has been twenty or thirty years since wire suspension bridges were introduced into this country—the first one being the aqueduct over the Allegheny river, built in 1845—he knew of no one built here prior to 1837; and that suspension bridges have not been long enough in use to be thoroughly tested, experience, thus far, being rather against their durability.

That before 1837 there were no bridges in use but pier

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

bridges. The spans of defendants' bridge are over the ordinary span of bridges about here. Does not know whether the piers were straight with the current when they were built. The effect of filling out the Pittsburgh side has been to change the current, part of which filling has been recent.

The plaintiff also called James H. Hays, who testified that the piers of the bridge are over 200 feet apart, and the river, at flood, is about 1500 feet wide. Has known the location of the bridge for some fifty years. The channel is near the Pittsburgh shore, and the second pier is about the middle of it in low water. When the river is up, the water is good the whole width; but even in high stages the boats are usually navigated down the Pittsburgh side. Both before and since the dam was built, that would be the proper channel. When the water is high, it is difficult to navigate boats past these piers. That he regarded the second pier as a great obstruction, and if it had been moved fifty or a hundred feet out or in, it might have made a difference. Thinks the piers are too close. Does not think any material alteration in the river shore has been made since the bridge was built. Has seen one to four wrecks about the piers. The proper coal-boat channel is between the first and third piers; when there is plenty of water, boats could pass between any of the piers; but coming out of the locks, the place mentioned is the proper channel. One wreck was plaintiff's, one was Watson's. Witness further testified that at sixteen feet stage, and less, boats can float from shore to shore. Before dam was built, boats used to moor above and below where the bridge is, to provision, &c. Have seen boats go farther over than third pier. Don't know of any lost there. Everson made a point out in the river some time since, and since the bridge was built he has continued to fill out above that point. Connellsville Railroad has been filling out since the bridge was built. I don't mean to say that, at an ordinary stage, the boats would be confined to the space between the first and third piers. The river has been filled out at Everson's not less than fifty to sixty or seventy feet. Above Everson's it has been filled out considerably. If I was running a steamboat, I would go down between the second and third pier, and up between the first and second pier.

The plaintiff also called a large number of coal-boat pilots, and other witnesses acquainted with the navigation of the Monongahela river at defendant's bridge, before and since it was built, who proved in substance that the second pier of the bridge, from the Pittsburgh shore, is located about the middle of the coal-boat channel, on ordinary rises for such craft, that being the part of the river where the low water channel is located, the said pier being built a little to the left of the channel, the deepest water, and on the edge of the bar; before the bridge was built there was

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

no particular place there where boats uniformly run; that the second pier, in fact all of them, are obstructions to coal-boat navigation; that before the erection of the bridge, on ordinary coal-boat stages, could run coal-boats from shore to shore; that for a long time prior to the completion of the bridge, in the summer or fall of 1857, the coal trade was carried on upon said river southward, on the ordinary rises of water of twelve feet and upwards, with coal-boats like those of the plaintiffs, drawing from six to eight feet of water, the accustomed channel for which being about the place where the second pier of the bridge from the Pittsburgh side is built, the best water being between the first and third piers, though boats did sometimes go out further; but before and since the bridge was built, the *ordinary channel for coal-boats* was from the shore to about the third pier, and over the location of the second pier, that being the safest place coming out of the "locks" and passing down the shore for a guide to run by; that the danger in passing the piers now is greater the farther boats go off shore, the safest place being between the first and third piers; that the bridge obscures marks to run by, and pilots have no guide to keep them in the proper place to pass the bridge below; that the second pier is a material obstruction to coal-boat navigation at all times, but it is especially so when the Monongahela river is the master stream, and there is more or less of a current therein, which is the case upon all rises in the Ohio river coming chiefly or entirely out of the Monongahela; that from the fall of 1857, when the bridge was completed, till the spring of 1860, the coal-boat rises in the Ohio came chiefly out of the Allegheny river, and at such times the current in the Monongahela becomes slack by reason of the back water as far up as the dam on the slack-water, and there is little or no current around the piers of defendants' bridge, rendering navigation comparatively safe, so long as the current remains slack; that the rise in the water at the time the plaintiff's coal-boat was lost on the second pier of defendants' bridge, came out of the Monongahela, and had attained to great depth, but was falling, and measured about fourteen feet; that the current was swift, and the coal-boat and a mate for it had been moored above the bridge on the Pittsburgh side, near the foundry, for some time, but as coal-boats were passing the locks, it became necessary to move with the plaintiff's boats, which were rigged and equipped in the ordinary manner, and provided with a competent pilot and crew, there being danger of said boats being injured by other boats passing, as the coal fleet from above the locks was passing through, and must go by the plaintiff's boats; that having cast off the lines, the pilot, considering it proper so to do, set out upon his voyage to Louisville, Kentucky, with the coal-boats, and in attempting to navigate them down along the ordinary

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

coal-boat channel, exercising ordinary care and skill, he aimed to pass between the first and second piers of the bridge from the Pittsburgh side, and while so navigating said boats, the boat in question—the starboard boat—was driven against second pier, and was thereby wrecked and sunk, and became a total loss.

The witness who saw the boats, testified that great care and exertion was used by the pilot and crew to avoid the pier; and that the collision occurred without fault on their part, owing to the position of the second pier of the bridge; and that by removing that pier, or shifting it further into the stream, and out on the bar, the obstruction complained of would be greatly, if not entirely, removed, where ordinary care in navigating is used. That among the boats lost against this and the adjacent piers, were the plaintiff's boat, Robbins & Jenkins's boat, Corey's boat, Stafford's *two* boats, and other boats seen lying sunk below the bridge, names of owners not remembered.

The plaintiff then offered testimony as to the value of the boat and coal lost, which was estimated at the sum of $2000; showing that it was sound, and of the ordinary size and class used; and rested his case.

The defendants' counsel thereupon moved the court to nonsuit the plaintiff, and assigned the following reasons:—

1. Upon the pleadings and evidence there can be no recovery.

2. This corporation is not liable to consequential damages.

3. Whether this bridge has been built in accordance with its charter or not, must be determined in a proceeding by the Commonwealth.

To this motion the plaintiff's counsel objected:—

1. Because the declaration as filed in the case and amended upon the trial, and the evidence produced in support thereof, showed conclusively that the defendants have not built their bridge in accordance with their charter, and have unlawfully obstructed the navigation of the Monongahela river past the piers of the bridge with coal-boats, and that the piers in question, by reason of their location, were and are a material obstruction to navigation, and a common nuisance in said river.

2. Because the evidence showed clearly that the defendants have *carelessly, negligently, and unlawfully* located, constructed, and built the second pier of their bridge from the Pittsburgh side in the ordinary channel for coal-boats, and have there kept and maintained the same, in violation of their charter, and in derogation of the rights of the public.

.3. Because the court did not reduce to writing, to be returned with the record in the case, all the material evidence produced upon the trial.

The court (Hampton, J.), after argument of counsel, granted the motion to nonsuit the plaintiff, considering no Acts of Assem-

[Clarke v. Birmingham and Pittsburgh Bridge Co.]

bly except those put in by the plaintiff, and then and there directed judgment to be entered, according to the Act of Assembly, with leave to the plaintiff's counsel to move the court *in banc* to set aside the same.

Afterwards, on the 18th day of April, A. D. 1861, the plaintiff's counsel moved the court *in banc* to set aside the judgment of nonsuit so entered, and filed the following reasons:—

1. Under all the evidence and the law of the case, the plaintiff had good right to recover.

2. The court erred in sustaining the motion for a nonsuit upon the several legal positions assumed by defendants, as shown by the record.

3. The court erred in overruling the objections made in writing to the right to enter a nonsuit, on the grounds that the court did not reduce to writing all the plaintiff's material evidence on the record.

4. The court erred generally in granting the nonsuit.

But the court, after argument of counsel and due consideration, refused to set aside the nonsuit. To which rulings and judgment of the court the plaintiff's counsel then and there excepted.

The case was thereupon removed into this court by the plaintiff, for whom it was averred that the court below erred in entering judgment of *nonsuit* for the reasons assigned by the defendants, and in refusing to set aside the judgment of nonsuit aforesaid.

*J. P. Penny* and *Alexander W. Watson*, for plaintiff in error, contended that the judgment of nonsuit was improperly entered, 1. Because there was evidence of want of care and skill, and of gross negligence in the location and construction of the piers, which were proper for the jury: Baker v. Lewis, 9 Casey 305.

2. Because the second position taken by defendant, to wit, that "this corporation are not liable for consequential damages," is untenable: Henry v. The Hard Street Bridge Company, 8 W. & S. 87; Schuylkill Navigation Company v. McDonough, 9 Casey 79; Chestnut Hill Turnpike Company v. Ritter, 4 S. & R. 16; Dec. of Rights, § 11; Townsend v. The Susquehanna Turnpike, 6 Johns. 91; Merrimack River Locks v. Riddle, 7 Mass. Rep. 169. The Acts of Assembly of Aug. 14th 1725, § 2, and March 23d 1803, § 3, prohibit such erections. They have not been repealed expressly or by implication: Dunn v. The Commonwealth, 6 Barr 385; Street v. The Commonwealth, 6 W. & S. 212; Bank v. The Commonwealth, 10 Barr 448; 4 Yeates 181, 215. Whether the defendant be an individual or a corporation, the law is the same, especially where malfeasance, neglect, or abuse of privileges is proven: Plumer v. Alexander, 2 Jones 85; Oliphant

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

*v.* Smith, 3 Penrose & Watts 180; Dugan *v.* The Monongahela Bridge Company; Henry *v.* The Bridge Navigation Company.

Defendants' charter authorizes the erection of a bridge, and they must exercise this power with reference to the relative rights of the corporation and the public. Such charters have always been strictly construed: Packer *v.* The Railroad Co., 7 Harris 218; The Commonwealth *v.* Erie and N. E. Railroad, 3 Casey 351; Commonwealth *v.* The Gas Company, 2 Jones 321. The ruling in Dugan's case is conclusive of this.

*Hamilton* and *Acheson*, for defendants in error.—A highway is the property of the state, and subject to its absolute direction and control: Philadelphia and Trenton Railroad Company, 6 Whart. 44; Commonwealth *v.* Erie and N. E. Railroad Co., 3 Casey 354. The navigation of a public stream may be impeded or broken up by the state at its pleasure: 6 Whart. 44. The legislature may obstruct navigable waters by authorizing the erection of bridges over them: Com. *v.* Charlestown, 1 Pick. 180; Com. *v.* Combs, 2 Mass. 489; Wales *v.* Stetson, 2 Id. 146; Arundel *v.* McCullough, 10 Id. 70; Hood *v.* Dighton Bridge, 3 Id. 267; Charles River Bridge *v.* Warren Bridge, 7 Pick. 446; Charlestown *v.* Middlesex, 3 Metcalf 202.

The bridge of defendants was erected in pursuance of legislative authority, between points fixed by the legislature. In the execution of this public improvement the corporation acted as the agent of the Commonwealth, and is clothed with her immunity from responsibility for *consequential damages* occasioned thereby, except so far as the act of incorporation declares otherwise: Monongahela Navigation Co. *v.* Coon, 6 W. & S. 114; Henry *v.* The Bridge Co., 8 Id. 85; Monongahela Navigation Co. *v.* Coon, 6 Barr 382; McKinney *v.* Monongahela Navigation Co., 2 Harris 65; O'Conner *v.* City of Pittsburgh, 6 Id. 187.

What restrictions are imposed on defendants by their act of incorporation? It directs that the bridge shall be elevated *to such height* as not to interfere with *the navigation of the river by steamboats*, and the location is fixed. As to the form or plan of the structure, the charter is silent. In this respect this case differs widely from Dugan *v.* The Bridge Company, 3 Casey 303.

The defendants' bridge is a wooden structure *supported by piers*, upon the plan in common use the world over, such as span almost every navigable stream in Pennsylvania, and which must have been in the contemplation of the legislature at the time of the grant of the franchise. Dugan *v.* The Bridge Company is decisive on this point. Alexander Hays, witness for plaintiff, testified that at the date of the original act authorizing the incorporation of defendants, there were no bridges in use but pier

[Clarke *v*. Birmingham and Pittsburgh Bridge Co.]

bridges—that suspension bridges have not yet been long enough in use to be thoroughly tested, experience, thus far, being rather against their durability.

There is no pretence that defendants have violated any *express* provision of the act of incorporation or its supplements. But it is claimed that this company is subject to certain *implied* limitations and conditions not contained in the grant itself. This is in the teeth of the decision in Dugan's case, 3 Casey 309, which was decided against the Monongahela Bridge Company, solely on the ground that their charter contained the express proviso that the company should not erect their bridge "in such manner as to injure, stop, or interrupt the navigation of said river by boats, rafts, or other vessels." No such clause is found in defendants' charter.

The plaintiff invokes to his assistance the Act of 14th August 1725, so ancient and unknown that it has no place in Purdon's Digest. But it has no application to the case, because, 1. It refers to streams navigable in the common law sense; which are streams in which the tide ebbs and flows: Kent's Com., vol. 3, pp. 411, 412 (marginal) *et seq.*; 2 Bouvier's Law Dict., title *River;* Baker *v*. Lewis, 9 Casey 301. At the date of said act the only recognised navigable streams were those which were tidal, and flowed into the Delaware. Chester river, mentioned in the first section of the act, is of this character.

2. The Act of 1725 (see section 3) only refers to bridges which have not been or may not be *authorized by public authority*.

3. The rule *expressum facit cessare tacitum*, is as applicable to statutes as to contracts: Dwarris on Statutes 54. The legislature said to this company, You may erect a bridge over the Monongahela, provided you raise the structure to such height as not to interfere with the navigation of the river by steamboats. The condition being expressed, none other is to be implied: Dugan *v*. The Bridge Company, 3 Casey 310.

4. The legislative intent as to the limitation of the powers of this company, is manifest from the repealing Act of 21st April 1857, P. L. 280, which relieved the defendants from the restrictions contained in the General Bridge Law of 1855.

The Act of 23d March 1803, cited by plaintiff, entitled "An act to authorize any person or persons owning lands adjoining navigable streams of water declared public highways, to erect dams upon such streams for mills and other waterworks," does not help plaintiff's case. Parties availing themselves of the provisions of that act do so upon the express condition contained in the act, that their dams "*shall not obstruct or impede the navigation.*" The cases of Bacon *v*. Arthur, Plumer *v*. Alexander, and

[Clarke v. Birmingham and Pittsburgh Bridge Co.]

Oliphant v. Smith, arose under it, and furnish no rule for this case.

Before defendants' bridge was built, there was no particular place where coal-boats uniformly ran, but they floated from shore to shore. If, therefore, the second pier be a nuisance, so are they all. No pier could possibly be erected that would not be some obstruction.

There was no sufficient evidence in the cause to justify the conclusion that the piers were injudiciously located. Alexander Hays, who stated that they do not stand straight with the current, also testified that he did not know how the fact was when they were built, as the recent filling out of the Pittsburgh shore had changed the current. The plaintiff has shown that the second pier is built to the *left of the deepest water, on the edge of the bar*. What more judicious location could have been chosen, with a view of avoiding the steamboat channel?

But we submit that the defendants are not responsible to the plaintiff for consequential damages resulting *from a mere error of judgment or an unfortunate exercise of the discretion vested in the corporation*, in the construction of its improvement.

Henry v. The Bridge Company, cited by plaintiff, is against him. The recovery in Chestnut Hill Turnpike Company v. Rutter was upon the ground of wilful misconduct in stopping a private watercourse, whereby the water was thrown back on plaintiff's premises, and a great quantity of hides destroyed. The case of The Schuylkill Navigation Company v. McDonough, 9 Casey 73, is not in point. By neglect of a duty prescribed in the charter, plaintiff's property was injured, and it was held that the company were liable to an action on the case. This is the principle of the cases in 6 Johns. 91, and 7 Mass. 169, cited by plaintiff.

The defendants' bridge having been erected under a charter from the Commonwealth, the lawfulness of the structure, in the absence of any complaint by the Commonwealth herself, cannot be drawn in question in this action, upon an allegation that the company have abused the powers vested in them by the legislature: Angell on Corp., § 777; Cleveland, Painesville and Ashtabula Railroad Company v. Erie City, 3 Casey 330; Dugan v. The Bridge Company, 3 Id. 313; Dyer v. De Pui, 5 Whart. 597; Commonwealth v. Erie and N. E. Railroad Company, 3 Casey 339; Pennsylvania v. Wheeling Bridge Company, 13 Howard 519.

The opinion of the court was delivered, January 6th 1862, by STRONG, J.—The plaintiff having lost a coal-boat by collision with one of the piers of a bridge over the Monongahela river, belonging to the defendants, brought an action against them to

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

recover compensation for his loss. The ground of their alleged liability was, that they had unlawfully built, kept, and maintained in the river certain piers located in and near the ordinary channel for coal-boats and other craft, and that the piers, by reason of their location, were an unlawful obstruction and common nuisance in the river. It was further averred that the defendants had carelessly, negligently, and unskilfully located, built, kept up, and maintained the piers in and near the ordinary coal-boat channel of the river, thereby obstructing the same, in consequence whereof the plaintiff's boat was wrecked upon the second pier, notwithstanding ordinary care and skill on his part.

The defendants were incorporated and empowered to build a bridge across the Monongahela, from the terminus of McKee street in Birmingham, to Cross street in the city of Pittsburgh, by virtue of an Act of Assembly, passed April 3d 1837, P. L. 239, and its supplements. But by none of these acts was the mode prescribed in which the bridge should be built. The Act of 1837 only required that the company should raise their bridge "a sufficient height above ordinary freshets in the Monongahela river, as not to interrupt the navigation of the said river by steamboats." The bridge not having been built within the time limited by the statute, other acts were subsequently passed, re-enacting the original act, and extending the time for commencing and completing the work. One of these, a supplement, passed April 9th 1856, P. L. 430, contained a proviso that the company should be subject to all the provisions and restrictions of the act regulating bridge companies, approved April 12th 1855. Among *these* provisions was one "that the bridge shall be so constructed as not to interfere with the free navigation of said creek or river." But by the subsequent Act of April 21st 1857, P. L. 280, the proviso in the supplement of April 9th 1856, which subjected these defendants to the provisions of the general Act of 1855, regulating bridge companies, was repealed. They had, therefore, a general power to construct their bridge, limited by no express restrictions. That power of course included the right to construct and maintain piers in the bed of the river; for at the time when the Act of 1837 was passed, and when the franchise was granted, support of bridges by *piers* was, as it still is, common and usual. It hardly needs to be said that the grant of a franchise is the grant of what is usual and necessary for its enjoyment. Unless, therefore, there was some restriction upon the rights of the defendants, other than such as was introduced into their charter, it is clear that their erection and maintenance of piers in the river was not unlawful. And if not unlawful, then the plaintiff can maintain no action on account of any loss he may have sustained, consequent upon the simple erection and maintenance. Then the act of the defendants was only the

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

exercise of an undoubted right belonging to the Commonwealth, and acting as they did, under the Commonwealth, they are clothed with all her immunities, for the legislature imposed no additional obligations. Undoubtedly piers are more or less obstructions to navigation. The evidence proves that they were in this case. But it does not follow from this that they are unlawful. The legislature might have encumbered the franchise granted with a condition that the navigation of the river should not be obstructed, or imposed upon the defendants as the price of the grant, an obligation to compensate any person who might suffer loss from an authorized obstruction. Had they done so the plaintiff would have had a right of action. It was for this reason that an action was sustained in Dugan *v.* The Monongahela Bridge Company, 3 Casey 310. In that case it appeared that the act authorizing the bridge contained a proviso that nothing in it contained should authorize the company to erect their bridge "in such a manner as to injure, stop, or interrupt the navigation of said river by boats, rafts, or other vessels." It was because the company took their right to build a bridge encumbered by this proviso, that they were held liable for the wreck of a craft upon one of their piers. So in Bacon *v.* Arthur, 4 Watts 437, and Plummer *v.* Alexander, 2 Jones 81, the defendants were held responsible for consequential injuries resulting from dams which had been erected under the Mill-Dam Act of April 23d 1803, because that act contains a requirement that dams erected, or kept in repair under it, on any stream, "shall not impede the navigation of such stream," and it provides for the recovery of damages in case of obstruction. But it was said in The Monongahela Navigation Company *v.* Coon, 6 Barr 382, and so it has often been ruled, that a grant of the eminent domain of the Commonwealth, so far as it is not specially restricted, passes the immunity from responsibility which pertained to it while it was in the hands of the state, and a corporation invested with it, being the *locum tenens* of the state, is liable for consequential damages to private property no further than it is declared to be so in the act of its incorporation. In other words, the state is bound to defend its servant as far as it could defend itself, unless the terms of the contract restricted the claim to protection when it was made." Applied to the present case the doctrine is, that if the Commonwealth had a right to build a bridge over the Monongahela, with piers to support it, and without liability to the plaintiff for any consequential damages he may have sustained, the defendants had the same right and the same immunity.

It is argued, however, that the defendants must be considered as having taken their charter subject to the restrictions of the Mill-Dam Act of 1803, and subject also to the requirements of an

[Clarke v. Birmingham and Pittsburgh Bridge Co.]

earlier act passed August 14th 1725. This last-mentioned act was primarily relative to a drawbridge over Chester creek, which was a navigable stream. The first section authorized rebuilding the bridge and keeping it in repair. The second section, which is the one relied on by the plaintiff, enacted "that no bridge, frame, or device whatsoever shall, at any time to come, be made, erected, upheld, sustained, or repaired, over any creek or river within this province, navigable for any sloop, shallop, flat, or other craft, that shall or may in anywise stop or hinder the navigation of any such sloop, shallop, flat, or other craft, or floats of logs, any law, custom, or usage to the contrary thereof, in anywise, notwithstanding." Surely the position is quite untenable that this act took away the power of any subsequent legislature to authorize the construction of a bridge with piers over a navigable stream. That would have been impossible. The argument of the plaintiff misinterprets the act. Its prohibition was of bridges erected without the authority of law. This is made perfectly clear by the third section or proviso, which expressly enacted that nothing in the act contained should be construed to forbid or hinder the maintaining or repairing any bridge erected by public authority. It has no application, therefore, to the charter of the defendants. Nor has the Mill-Dam Act which refers exclusively to dams erected under it, or, if it embraces other devices amounting to obstructions, prohibits only such as are not legalized by statute. Neither of these acts attempts to fetter subsequent legislation. And besides, the legislature, by repealing the clause of the supplement to the defendants' charter, which subjected them to the requirements of the general Act of 1855, clearly indicated an intention to exempt them from any express prohibition against obstructing, in any degree, the navigation of the river. Such having been the chartered rights of the defendants, the plaintiff's right to recover against them was not made out by proof that the piers, erected and maintained in the river, were obstructions to the navigation, and that in consequence of them his coal-boat had been wrecked without fault on his part. The plaintiff could not recover for anything caused by a lawful act of the defendants.

The other branch of the case is in the averments that the defendants had been guilty of negligence and want of skill in the construction and maintenance of their piers, a consequence of which was the loss which the plaintiff sustained. To sustain these averments, evidence was attempted to be given. There was no *proof*, however, of negligence in the work of construction itself, or of neglect to keep the piers in repair, or of any wanton misfeasance to the property or rights of the plaintiff. All that was even attempted to be proved was an alleged error in the location of the piers, and that they would have been smaller

[Clarke *v.* Birmingham and Pittsburgh Bridge Co.]

obstructions, had they been built in other parts of the river bed. Now, the right given by the defendants' charter to erect a bridge and construct piers, necessarily included a right to fix the number and location of the piers. The legislature did not define where they should be placed. They left it to the discretion of the company. It may be conceded that this discretion could not be wantonly abused, to the injury of the public, or of any private person. For a wanton abuse of it, resulting in an immediate injury to an individual, a private action might be maintainable. This was decided in Chestnut Hill Turnpike Company *v.* Rutter, 4 S. & R. 4, and in Henry *v.* Bridge Company, 8 W. & S. 27. But to hold the grantee of a franchise to erect a bridge responsible for damages resulting from a mistake of judgment in locating the piers; to treat such a mistake as of course culpable negligence, is to take away from the grantee that discretion which the legislature has conferred, and transfer it to a jury. Such is not the doctrine of the cases referred to. To hold it would be submitting to the jury to find what would be the best location, or rather what would not be the best, instead of leaving the decision of that question where the law has put it. And it would lead to this remarkable consequence: one jury might find that the second pier, upon which the plaintiff's boat was wrecked, is injudiciously and unskilfully located, without determining where it should have been; and repeated suits by the same plaintiff might compel its removal. Another jury might find it located in the right place, and a location in any other would expose the defendants to liability for damages. Can this be? Is legislative authority of no more avail than this? Is a question of engineering to be submitted to a jury every time a boat may happen to impinge on a pier? And is the discretion which the legislature committed to the directors of the bridge company to be *reviewed* and controlled every time by a new jury? There is no authority for such a doctrine, certainly not in Dugan *v.* The Bridge Company, or in Bacon *v.* Arthur, and it is impracticable. We denied it in a case somewhat analogous, when it was pressed upon us: Delaware and Hudson Canal Co. *v.* Torrey, 9 Casey 150. The bridge of the defendants is a public highway, erected over another highway by them acting as agents of the state, and it would seem that the state alone can interfere with the discretion given to its agents in such a matter. Can a private action be sustained against a railroad company for an unskilful location of their road, resulting in merely consequential injury to a private individual? Nobody has ever thought so. Can suit be maintained against commissioners of highways, or supervisors, for acts done in the exercise of their vested discretion? May juries condemn all our navigation companies, such as the Lehigh, the Schuylkill, and the Monongahela, because rafts or other unmanageable crafts are

[Clarke v. Birmingham and Pittsburgh Bridge Co.]

wrecked in their dams, and do it for the reason that in their judgment the dams are not judiciously located or skilfully constructed? May they condemn all county, railroad, or company bridges over the navigable streams of the Commonwealth, because in their opinion the piers are not in the most suitable places, or stand askew, when they think they should have been straight with the current? I find no such judicial decisions, nor any analogy in our law which would justify us in returning an affirmative to these questions. I admit that if the plaintiff had sustained special injury by the malicious, wanton, or arbitrary exercise of even an undoubted right of the defendants, he might have had his action. So also if there had been an immediate injury consequent upon a careless and negligent mode of constructing the piers. But when all the negligence complained of is attempted to be deduced from the alleged facts that the piers were put in the wrong place, and that they were put askew instead of straight, no private action can be maintained. If it can, as already said, the discretion which the legislature has vested in the defendants is transferred to a jury. The remarks of Mr. Justice Lowrie in Downing v. McFadden, 6 Harris 338, though made especially respecting official agents of the state, are worthy of attention in this case, even though not in every particular applicable. If a wrong has been done to the public by an improper location of the piers, the state has power to redress the wrong, and to compel the removal of the obstruction. It is impossible to accomplish this by a private suit.

The District Court was therefore right in entering a judgment of nonsuit against the plaintiff.

The judgment is affirmed.