## CHAS. JUTTE ET AL. v. KEYSTONE BRIDGE CO.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
NO. 2 OF ALLEGHENY COUNTY.

Argued October 28, 1891—Decided January 4, 1892.
[To be reported.]

1. The right of a corporation under its charter to erect a bridge over a navigable river, necessarily includes the right to fix the number and location of the piers at the discretion of the company. The company may be responsible to an individual for an injury resulting from a wanton abuse of the right, and the commonwealth may complain when the piers are injudiciously located.

2. But one whose boats are injured by striking against a pier, cannot recover damages merely because of a mistake of judgment in locating the pier; for the location and time of removal of the necessary false or temporary piers are likewise in the discretion of the company, and in the absence of wanton abuse, the exercise of such discretion cannot impose a liability for damages.

3. At all events, in the present case there being no evidence of want of reasonable care on defendant's part, and the undisputed facts indicating that the injury was due to a want of sufficient care on the part of plaintiff, resulting from his adoption of a particular method of passing under the bridge, the jury were properly instructed to render a verdict for the defendant.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 103 October Term 1891, Sup. Ct.; court below, No. 344 January Term 1890, C. P. No. 2.

To the first Monday of December, 1889, Charles Jutte, William C. Jutte and August Jutte, doing business under the firm name of Charles Jutte, brought trespass against the Keystone Bridge Company, to recover damages for the sinking of certain coal barges, in consequence, as was alleged, of negligence on the part of the defendant. As the acts of negligence complained of, the statement of claim charged that the defendant, in building a railroad bridge over the Ohio river at Beaver, Pennsylvania, negligently constructed two false piers in the main channel span, but one being necessary; that it unnecessarily constructed a false pier in the north channel span, before the removal of the said false piers from the main channel, and that it negligently permitted said false piers in the main channel to remain after they were no longer necessary. The defendant pleaded not guilty.

At the trial on February 24, 1891, the following facts were shown: The railroad of the Pittsburgh & Lake Erie Railroad Company extends from the city of Pittsburgh, along the south bank of the Ohio river, to Phillipsburgh, Beaver county, where it crosses said river by a bridge to the borough of Beaver, and thence extends to and beyond the western boundary of the state. The original bridge across the river was constructed under the direction of the secretary of war, who was invested by act of congress with the power to regulate the building of bridges over the Ohio river. It had two high channel spans. Of these spans the northern one was about three hundred feet long, and the southern one about four hundred fifty feet long. By direction of the war department, the company constructed near the south shore a long guiding dike, extend-

ing up the river above the bridge, the purpose of which was to facilitate the safe passage under the bridge of steamboats having coal barges in tow.

In 1889, the railroad company, having found it necessary to rebuild its bridge, communicated with the secretary of war, and obtained his consent to such reconstruction, upon the following conditions, which the company accepted :

" 1. One of the high spans shall at all times be open to navigation, and neither of the high spans shall be obstructed before June of the year when the repairs are to be made.

" 2. The superstructure shall be ready for erection as soon as the false work is finished, and the whole work of repair and the restoration of the channel shall proceed with the utmost possible rapidity."

Plans exhibiting the manner of carrying on the work were then prepared, submitted to the secretary of war, and approved by him. They provided for the temporary support of the new superstructure by means of false piers placed in the channel spans, two to be placed under the south span, and one under the north span. The locations of the false piers, as exhibited on the plans, were so arranged that a clear space of one hundred thirty-two feet would be left between the south abutment of the bridge and the false pier next to it ; a space of one hundred thirty feet between the two false piers under the south span, and a space of about the same size between the second false pier and the abutment at the northern end of that span.

The railroad company made a contract with the defendant bridge company for the construction of the new bridge in accordance with the said plans. The work of construction was commenced in June, 1889. Before its commencement, the defendant published a notice to navigators of the river, in the daily newspapers of Pittsburgh, to the effect that the left or south-channel span would first be obstructed, but that the right or north channel would not be obstructed until the removal of obstructions from the left channel.

On October 29, 1889, the new superstructure, spanning the south channel, was so far completed as to be let down upon the abutments which were to be its permanent support; the dismantling of the false piers in that channel were commenced, but had been interrupted by a rise in the river which began

two days before, and the false pier in the north channel had been partly constructed; when the plaintiffs, with full knowledge of these facts, started their steamer Charles Jutte, with a tow of five coal barges, down the river from Pittsburgh. The barges constituting the tow were so arranged that three of them were abreast, in front of the steamer, and one was on each side thereof. The combined width of the three front barges was seventy-five feet. In an attempt to run under the bridge, between the south abutment and the false pier which stood next to it, the tow of the Charles Jutte struck the false pier, and two of the barges were wrecked and sunk.

Witnesses for the plaintiffs testified that in their opinion it was unnecessary to place more than one false pier in the south channel. Witnesses for the defendant testified that it would have been impracticable and dangerous to use but one. Edward Smith, a witness for the plaintiffs, testified that he was a member of the carpenters' gang employed by the defendant on this bridge; that, while he was "not exactly positive," if his memory served him rightly the superstructure of that part of the bridge, spanning the south channel, was supported by the permanent stone piers some ten or twelve days prior to the accident, probably, " from the neighborhood of the tenth " of October; that after this, the false work was no longer necessary, and there was a period of eighteen or nineteen days prior to the accident, during which he "would naturally suppose a reasonable force of men would be able to accomplish" its removal. On cross-examination, the witness said that the removal of the false pier was commenced immediately after the superstructure became self-supporting, and was prosecuted until stopped by the high water. E. J. McCain testified for the defendant that the bridge did not become independent of the false piers until October 25th.

At the time of the accident, the Charles Jutte was quartering, or flanking; that is, as she moved down the river her stern was near the guiding dike, and the front of her tow was farther out in the stream, her wheel being in motion for the purpose of backing sufficiently to keep her in that position. Witnesses for the plaintiffs testified that she was handled properly and that her pilot did everything that could be done for her safety, but she was carried over against the false pier by the current.

Arguments.

Testimony for the defendant tended to show that the Charles Jutte had gotten too far out in the river, and too close to the steamer Fred Wilson, which was just ahead of her, and that the accident was due to the manner in which the Charles Jutte was handled. It was shown by the witnesses on both sides of the case that a number of other boats with tows went through safely on the same day, both before and after the accident to the Charles Jutte, by dropping down along the guiding dike. Parts of the testimony are quoted in the opinion of the Supreme Court, infra.

At the close of the testimony, the court, EWING, P. J., charged the jury orally, and answered a point presented by the defendant as follows:

Defendant's counsel ask the court to charge the jury as follows:

1. Under the pleadings and evidence in this case, the verdict should be for the defendant.

Answer: This point is affirmed.[1]

—The jury having returned a verdict for the defendant, and judgment having been entered, the plaintiffs took this appeal assigning for error: 1. The affirmance of defendant's point.[1]

*Mr. W. P. Potter* and *Mr. William A. Stone*, for the appellants:

1. There was sufficient evidence of negligence in not removing the false pier upon which the plaintiffs' barges were wrecked, to submit to the jury. The evidence was conflicting as to whether it was left standing an unreasonable time after it was no longer needed, and it was the province of the jury to pass upon the disputed fact: Delaware R. Co. v. Jones, 128 Pa. 308. It was for the jury to say whether the defendant was guilty of negligence in not sooner removing that pier, and not the court: Curtin v. Somerset, 140 Pa. 70; Horton v. Elec. Light Co., 140 Pa. 618.

2. We claim, also, that the placing of a pier in the right or north channel, before the removal of those placed in the left or south channel, was such a disregard of the rights of navigators as to justify a recovery. This may be said to have caused the accident, by forcing the plaintiffs to run the south channel, in the attempt to do which they were wrecked. The

duty to keep one of the two channels open at all times, was recognized by the agreement with the secretary of war. If the defendant is to be held excusable in following the plans approved by the secretary of war, by reason of his consent thereto, must it not be held to a compliance with the terms of the accompanying agreement?

*Mr. P. C. Knox* (with him *Mr. W. B. Rodgers*), for the appellee :

Under its charter, the Pittsburgh & Lake Erie Railroad Co. had the power to construct its bridge over the Ohio river, without liability for consequential damages ; and the exercise of its discretion in the location of piers could be questioned only by the commonwealth or the United States: Clarke v. Bridge Co., 41 Pa. 147 ; Monongahela Bridge Co. v. Kirk, 46 Pa. 112 ; Whitaker v. Canal Co., 87 Pa. 34 ; Hamilton v. Railroad Co., 119 U. S. 280. There was no real dispute as to the question of due diligence in removing the false piers after they had answered their purpose. The plaintiffs' only witness on this point agreed with the defendant's witnesses, that the removal was commenced as soon as possible after the bridge became self-supporting, and there was nothing for the jury to decide. As to the subject of placing a pier in the north channel, the secretary of war had no authority to prescribe the method of reconstructing the bridge ; but if he had, his directions were complied with, all that he required being that one of the high channels should be at all times " open to navigation." Moreover, the erection of the pier in the north channel was not the proximate cause of the injury, in the south channel, to the boats which the plaintiff sent down from Pittsburgh with knowledge of the condition of the north channel.

OPINION, MR. JUSTICE GREEN :

There is neither allegation nor proof in this case of any negligence in the building of the piers or false works of the new bridge, or of any obstruction of the navigation on account of the mere presence in the river of these necessary structures. That proper materials were used, that adequate structures were erected, that a sufficient water space of one hundred and thirty-six feet or thereabouts was left clear for the navigation of the river, were fully established and uncontradicted facts.

In Clarke v. Bridge Co., 41 Pa. 147, we held that a general power given by law to a bridge company to construct a bridge over a navigable river, included the right to construct and maintain piers in the bed of the stream; that, in the proper exercise of such right, the bridge company is not liable for any loss sustained, consequent merely upon the erection and maintenance of the piers, which, though they may be in some degree obstructions, are not for that reason alone unlawful; that the right to erect a bridge under a charter, necessarily includes the right to fix the number and location of the piers at the discretion of the company; that the company might be responsible for a wanton abuse of the right, but are not responsible where the damages result from a mistake of judgment in locating the pier. STRONG, J., in the course of the opinion, said:

"But, to hold the grantee of a franchise to erect a bridge responsible for damages resulting from a mistake of judgment in locating the piers; to treat such a mistake as of course culpable negligence, is to take away from the grantee that discretion which the legislature has conferred, and transfer it to a jury. Such is not the doctrine of the cases referred to. To hold it, would be submitting to the jury to find what would be the best location, or rather what would not be the best, instead of leaving the decision of that question where the law has put it. And it would lead to this remarkable consequence: One jury might find that the second pier, upon which the plaintiff's boat was wrecked, is injudiciously and unskilfully located, without determining where it should have been; and repeated suits by the same plaintiff might compel its removal. Another jury might find it located in the right place, and a location in any other would expose the defendants to liability for damages. Can this be? Is legislative authority of no more avail than this? Is a question of engineering to be submitted to a jury every time a boat may happen to impinge on a pier?"

These doctrines were repeated and enforced in Monongahela Bridge Co. v. Kirk, 46 Pa. 112, where we held that, if the piers authorized by the act are injudiciously located, the commonwealth may complain, but one whose boats were injured thereby cannot avail himself of it in an action for damages. In Whitaker v. Canal Co., 87 Pa. 34, the subject was again considered and the rule of non-liability again enforced, and it was

held that the mere fact that the plaintiffs' rafts were injured by the dam in question was not enough to justify a recovery.

The question, then, whether the false pier against which the plaintiffs' tow collided, was properly located or properly constructed or maintained, or whether a sufficient width of water was left between that pier and the shore where the long dike was erected, is out of the case. Indeed, it is not seriously contended for the plaintiffs that there was negligence on the part of the defendant in any of these respects, and the evidence that the water-way was sufficient in width is simply overwhelming.

It is necessary to inquire, therefore, what is the negligence complained of, upon which a right of recovery is alleged against the defendant? In the printed argument for the plaintiffs, it is claimed " that there was sufficient evidence of negligence in the defendant, in not removing the false pier upon which the plaintiffs wrecked their barges of coal and coke, to submit to the jury." In support of this contention, it is alleged that there was an interval of eighteen or nineteen days, from the tenth of October to the twenty-ninth, when the accident occurred, which was not all needed for the removal of the false pier, and, by necessary inference, that it was the legal duty of the defendant to commence the removal on the tenth, and complete it before the twenty-ninth. The argument is that, if the false pier had been entirely removed before the twenty-ninth, the accident would not have happened. It is rather an illogical process to deduce the fact of negligence from the mere fact of the subsequent accident. Of course, if the pier was not in place on the twenty-ninth, the accident would not have happened, because it could not; but that fact proves nothing in the way of culpable negligence on the part of the defendant. It would be no more proof of negligence in the defendant than of contributory negligence in the plaintiffs; in fact not so much, because the pier had been in its place for months, and had not impeded navigation. On the very day of this accident, thirty or forty barges and boats went through the same span without injury; some before, some after, and some at the very time the plaintiffs' boats were passing through. If the mere presence of the pier caused the injury to the plaintiffs' boats, it should also have caused similar injury to the other vessels, but

it did not.  It follows that something else or other than the mere presence of the pier caused the plaintiffs' injury.  If we look into the testimony, and it is testimony which is not contradicted, we learn very readily what was the matter, and what was the real cause of the accident.

Capt. John A. Wood, an old and very experienced navigator of the river who owned a fleet of eight or more steamboats and a large number of barges, coal boats, and other floating craft, was very largely engaged in the mining and shipping of coal on the river and had followed the business since 1857, was on the river floating his own vessels on the day of the accident.  He was present on the dike at the bridge, saw the plaintiffs' vessel going through, and witnessed all the details of the occurrence.  After testifying to the state of the water on the morning of the twenty-ninth of October—between nine and ten feet—and that he went down the river early to make an examination of the bridge and the river, and to help his own boats through, he said he learned that there was a clear water-way of one hundred and thirty-six feet between the pier and the cribbing, and he testified that a water-way of that width was sufficient to pass boats through.  He was asked :

" Q.  Did you examine it for the purpose of determining whether you would try and put yourself through?  A. I did.  Q. And did you make up your mind it could be done with safety ?  I did, or I would not have attempted it.  Q. What other conditions were there affecting the navigation at that spot excepting the confined water, that is, confined to one hundred and thirty-six feet?  Was there anything there that day that rendered navigation any more or less difficult than it was, or rendered it difficult at all, from the dike down to the bridge, in the way of current, winds, or anything else ?  A. I think not.  If I remember right, it was rather a favorable day for navigation.  Q. Did you see any cross-current bearing out from the dike on to this false pier, such as to impel a boat over on to it ?  A. At certain stages of water the current draws out to the right-hand pier, but we found none but what we were able to overcome by backing or flanking in towards the dike.  Q. So that there was nothing in the current itself that would carry a boat contrary to the wishes of a man who was navigating it, if he had navigated it right, was there ?  A. No, sir.

Q. How many boats went through there that day? A. I don't
remember exactly; I think five or six of them. Q. Have you
a memorandum of them there? A. The Jim Wood took six
barges, two box-boats, through, four wide. Q. A hundred feet
at the head? A. Yes, sir. Q. What time of day was it she
went through? A. I haven't got the time of day down. It
was along in the forenoon, some time. Q. The next boat was
what? A. I don't know that I have them in order, particu-
larly. The B. D. Wood took five barges and a box through,
and one flat. Q. How were they hitched? A. Three and
two, as we call it. Q. That would be seventy-five feet at the
head? A. Yes, sir. The Reese took three barges through;
the Nellie Speer made two trips, with three barges each; and
the Dave Wood, one of the smaller boats, took two light coal
boats and three barges through; they were hooked up two
or three. . . . . Q. She is a little boat? A. Yes, sir. Q. How
does she compare with the Jutte? A. About the same size.
. . . . . Then the D. B. Wood took a few again in the even-
ing, three barges and two flats, just before dark. Q. So that
there were actual passages of your vessels with tows through
this space how many times that day? A. Seven or eight
times. Q. Did you see them pass through? A. Yes, sir.
Q. All of them? A. Yes, sir."

After describing how the boats passed through, by flanking
along the dike and keeping pretty close to it, and working the
tow under the bridge, so as to clear the shore below, he was
asked: "Q. All of your boats went through with safety?
A. Yes, sir. Q. Did you see any other tow-boats pass through
there that day? A. Yes, sir; saw quite a number. Q. Have
you any idea how many? Could you give us an approxima-
tion? A. I suppose there were thirty or forty trips made
through; perhaps some of them made two or three trips, like
our own boats. . . . . Q. How many did you see strike the
pier? A. One. Q. What boat was that? A. One of Mr.
Jutte's boats; I think the Charles Jutte. Where were you
standing when the Jutte struck this pier? A. On the upper
end of the guiding dike. Q. What was the situation of the
Jutte when you first saw her? A. She was coming down very
close behind the Fred Wilson. Q. How close? A. Well, I
can scarcely say how close; she was down, what I call down,

Opinion of the Court.

and outside the head of her tow; down and outside the stern of the Fred Wilson. Q. In other words, standing on the dike and looking across the river, the forward end of the Jutte's tow was lapping over the stern of the Fred Wilson? A. Yes, sir. Q. How much? A. Well, I can't tell exactly how much; they were a good ways out in the river; I thought they were too far out in the river at the time. . . . . Q. Was the Jutte too far out in the river to run that span properly, in your judgment? A. She was. Q. Was she too close to the Fred Wilson to run it with safety, in your judgment? A. I thought she was closer than she ought to be. Q. Did you give her any signal or warning to that effect? A. I did. Q. What did you do? A. I told them they were too far out in the river, they would hit that cribbage. Q. That is the false pier, you mean? A. Yes, sir. Q. Was it your judgment, up at the head of the dike, when you looked out and saw the Jutte and the position she was in, that she would strike that cribbing on account of her position? A. I called to them that they had better pull in, or they would hit that cribbing." The witness then testified how the Jutte was handled; that she was so far out in the river that the efforts of the men to get her in near the dike were of no avail, and he was asked: " Q. Was there any necessity for the steamer Jutte being so far out in the river, and so close on to the steamer Fred Wilson? A. I didn't think there was, the way I looked at it then. Q. Was it not a bad and dangerous method of navigation, in going down through the bridge, for one boat to be running so close on to another as that was? A. I certainly thought it was not right." He further testified that there was nothing in the conditions there at that time to prevent the Jutte going through safely, if she had been close into the dike where his vessels went, and that he attributed the Jutte's striking to her being too far out in the river. The testimony of this witness was quite voluminous and full of detail.

There was abundance of other testimony in corroboration of that of Capt. Wood, especially in the evidence given by Capt. Reno, who was captain and pilot of the Fred Wilson, and of Z. T. Baker, the mate; both of whom condemned as unsafe the handling of the Jutte. The testimony of August Jutte, who is one of the plaintiffs, and of Capt. Thomas, who was captain of the

Opinion of the Court.

Jutte when the accident occurred, does not differ in any material respect from that of Capt. Wood and Capt. Reno and Baker, except that they thought their mode of handling the Jutte was right; but the event proved that they were in error on that subject. Several of the plaintiffs' witnesses, who were rivermen, proved that they took tows under the bridge in safety on the same day of the accident, and all of their testimony simply confirmed that of the defendant's witnesses, and tended to establish the proposition that vessels could be taken through in safety, if sufficient care were exercised. Capt. McDonald, one of the plaintiffs' witnesses, made two successful trips under the bridge on the twenty-ninth. Capt. Eckly, another witness for plaintiffs, made one successful trip on the twenty-ninth, and another one the next morning. Capt. Gould, also testifying for plaintiffs, made a trip on the thirtieth and saw many other tows go through safely. W. J. Wood, another of plaintiffs' witnesses, testified that he was at the bridge on the twenty-ninth, after the accident, and saw a number of boats go through successfully on that afternoon, and went through himself twice the next day. Capt. Moran, another of plaintiffs' witnesses, testified that he made two trips on the twenty-ninth, with a number of boats and barges, and with but little trouble. Capt. Wilkin, another witness for plaintiffs, went through in the evening of the twenty-ninth, successfully, with six barges and two flats, and he had ninety-one feet of width of vessels at the head of his tow, whereas the Jutte had only seventy-five, and it was after dark when he went through. Capt. A. McDonald, another of plaintiffs' witnesses, went through safely on the afternoon of the twenty-ninth with six barges, four in front, making a width of one hundred feet at the head of the tow.

Perhaps the testimony of Capt. Merriman, a witness for the defendant, illustrates this branch of the case as well as, if not better than that of any other witness in the case. He was an old waterman of forty-five years' experience on the Ohio, and for many years a pilot. He was at the bridge on the twenty-ninth, and saw the accident. After describing the whole of the occurrence, he was asked: " Q. Was she, (the Jutte,) or was she not, in your judgment as a pilot, too close to the Fred Wilson? A. She was uncomfortably close; yes, sir. Q. Was she too close for good, safe navigation? A. Yes, sir; she was

too close.   Q. Was she inside or outside, or immediately behind the Fred Wilson ?   A. She was rather outside.   Q. Farther out towards the beam side?   A. Yes, sir. . . . Q. Have you navigated through and under that bridge ?   A. Yes, sir. Q. Have you used that guiding dike ?   A. Yes, sir.   Q. I wish you would state what, in your judgment, would have been the proper way for the Jutte to have handled herself, in order to pass through that space between the false pier and the Phillipsburg abutment on that day, as the conditions were, safely.   A. Well, the proper position, in my judgment, would be to get in to the dike, out pretty well on the dike, at the head of the dike, and get as close as you pleased to it.   You can run as close as you like there,—even if you touched the dike, you would not hurt anything,—and drop the dike, keep the same distance, and drop on down along the dike, and you are in proper shape all the time.   There is no difficulty ; you get in good position above.   Q. Is that the way the Wilson went down ?   A. Yes, sir.   Q. Did you see other boats go down that day ?   A. Yes, sir.   Q. How many of them ?   A. I seen several boats go down.   I didn't see any of them in trouble but the one. . . . . . Q. Had the Jutte gone down the way the other boats went down that you saw, or in the way you describe, do you think it could have passed through there with safety ?   A. I think so.   I think there would have been no trouble."

There was more of such testimony, but it is not necessary to repeat it.   The whole testimony, that of the plaintiffs as well as that of the defendant, clearly proves that whether an accident happened of the kind that is in question here, depended upon the manner in which the tow was worked, and that consideration eliminates from the case the proposition that the mere physical presence of the pier can be treated as the cause of the accident.   Of course, if the pier were not there, the collision could not have taken place ; but the pier was a perfectly lawful structure, which the defendant had the right to erect and maintain, as much as the plaintiffs had the right to navigate the river with their boats.   It certainly cannot be contended that, in any point of view, the defendant can be held liable for negligence growing out of the presence of the pier because the persons navigating the Jutte chose to go through

in one way rather than in another. The mode of conducting
the transit was exclusively the act of the plaintiffs over which
the defendant had no control; and, of course, there can be no
liability of the defendant in such a situation.

The plaintiffs contend, however, that it was negligence of
the defendant not to have removed the false pier a few days
sooner than they did, and therefore a liability arises. Inde-
pendently of the insufficiency of the testimony to establish this
allegation, the subject is affected by the consideration that the
construction, and also the maintenance of the pier, are within
the power and the discretion of the persons authorized to erect
the pier. The cases hereinbefore cited are to this very point.
It cannot be that the question whether a false pier should be
removed on one day or another should be at the disposal of a
jury, so that one jury may find in one way and another jury in
another way, on that subject. The removal of a false pier
which is a necessary part of the construction of the bridge, is
as much a part of the discretionary power of the persons ex-
ercising the franchise of building the bridge as is any other
part of the work. It is only for a wanton abuse of this discre-
tion that a liability arises on account of accidents; and this
was expressly ruled in Clarke v. Bridge Co., supra. Of course,
there is not a scintilla of proof in the case of any such conduct
on the part of the defendant. The plaintiffs seek to support
their contention, on this subject, by the argument that the
superstructure was finished on the tenth of October, and that
the false pier might have been removed before the twenty-ninth;
but the witness upon whose testimony this contention is based
is quite uncertain about his dates, and he does testify that the
defendant commenced tearing down the pier immediately after
the bridge became self-supporting. He was asked: " Q. Then,
how soon after the bridge was independent of the false pier did
they commence to tear the false pier down? A. Well, to the
best of my knowledge, they commenced right away, as soon as
possible after it was self-supporting. Q. And they prosecuted
that work up until the river raised? A. That is what I said."
The following is the way in which the witness fixed the dates:
" Q. How long a time before that was this iron span or super-
structure supported on those piers, and how did the railroad
trains run on that iron structure? A. Well, as best my mem-

Opinion of the Court.

ory serves me, it was some ten or twelve days before this thing occurred, probably from the tenth up to the twenty-ninth; I am not exactly positive as to the days, but, if my memory serves me rightly, it was from the neighborhood of the tenth up to the twenty-ninth, the day of the accident." It will be seen, at once, that there was no certainty of time in this testimony, in which the witness first says it was ten or twelve days, and afterwards that, if his memory serves him rightly, it was from the neighborhood of the tenth up to the twenty-ninth. What he means by "the neighborhood of the tenth" we cannot know, but we do know that he subsequently said they commenced pulling down the pier "right away, as soon as possible, after it (the span) was self-supporting." Of course, the defendant required a reasonable time to pull down the pier after they commenced it; and, as they continued directly on in their work until the high waters stopped them, there is no room for an allegation of culpable negligence in this respect.

But, as we have said in the former part of this opinion, even if the pier was standing a few days longer than might have been absolutely necessary, the question still remains, how did the accident occur? We have seen that it resulted from the adoption of one method of going through, rather than another; and for that there can be no liability of the defendant, in any aspect of the case. There may have been many other reasons for the slight delay, arising from other work requiring attention, and other similar causes, all within the discretion of the defendant. The defendant could not know that a rise was about to take place in the river, and was therefore not subject to a legal duty to take extra precautions against it. In every point of view in which the facts can be regarded, they fail to show any want of reasonable care on the part of the defendant, but they do show strongly that the accident was due to a want of sufficient care on the part of the plaintiffs.

Judgment affirmed.